CREATIVE COUNTRY DAY SCHOOL OF SANDY SPRING, INC. ET AL. *v.* MONTGOMERY COUNTY BOARD OF APPEALS ET AL.

[No. 291, September Term, 1965.]

554

*Decided May 27, 1966.*

The cause was argued before PRESCOTT, C. J., and HAM-
MOND, HORNEY, BARNES and McWILLIAMS, JJ.

*Leonard E. Cohen,* with whom were *George Gump, George
W. Liebmann* and *John D. Bowman* on the brief, for the ap-
pellants.

*William M. Canby,* with whom were *Miller, Miller & Canby*
and *Robert G. Tobin, Jr., County Attorney for Montgomery
County,* on the brief, for the appellees.

BARNES, J., delivered the opinion of the Court.

The appeal in this case is from an order of the Circuit Court
for Montgomery County (Pugh, J.) entered on July 7, 1965
affirming a decision of the County Board of Appeals for Mont-
gomery County (the Board) which denied on December 12,
1963 the petition of the appellants, Creative Country Day
School of Sandy Spring, Inc. (Country Day School) and Sandy
Spring Acres, Inc. for a special exception under Sections 104-
29(m)1(c)(5), 104-29(w)(2) and 104-29(i)1(e) of the Mont-
gomery County Code of 1960 to permit the petitioners to op-
erate a private educational institution for forty or more nursery,
kindergarten and elementary school children, a riding stable and
a child care home. At the time of the hearing before the Board,
Sandy Spring Acres, Inc. was the contract purchaser of the
land involved in the petition consisting of two parcels, known

as the Daymude and Hobbs property, containing approximately 39 acres located on Route 108 in the Olney Election District, Sandy Spring, Maryland (the subject property). That corporation is now the owner of the subject property, title having passed to it subsequent to the hearing. Country Day School is the lessee of the subject property. The petition of the appellants was denied by a three to two vote of the Board.

The subject property lies between Olney and Ashton in Montgomery County. It fronts on Route 108 for approximately 350 feet. In general outline it is a panhandle of approximately 9 acres (the Hobbs property) fronting on Route 108 (which runs approximately east and west at this point) with the main body of the property consisting of approximately 30 acres (the Daymude property) averaging about 900 feet north and south and about 1600 feet east and west. Access to the main body of the subject property to Route 108 will be over the panhandle section which will not be used for any other purpose after the Hobbs' vacate the residence on the panhandle section, other than for parking areas for automobiles and buses.

Route 108 is a black top road with a width of about 18 or 20 feet. It has a speed limit of 40 miles per hour. Buford Hayden, an expert land planner, who testified for the petitioners before the Board, stated that the sight distance to the entrance to the subject property from west to east is over 1000 feet and is "very good", while the sight distance from east to west is between 300 to 400 feet and "is not so good."

The general character of the area in which the subject property is located is that of a residential agricultural district. It is appropriately zoned in an R-A (residential-agricultural) zone. There are several large houses on large tracts in the immediate neighborhood of the subject property. For example, the property of Arthur D. Farquhar adjoins the Daymude portion of the subject property and consists of 132 acres with a dwelling and other buildings. This property has been owned by the Farquhar family for 137 years. Nearby are even larger agricultural properties. There is, however, a small subdivision called Olney Estates on Dominion Drive to the west of the subject property which consists of 12 homes on one-half acre lots. The general Sandy Spring-Ashton area is sparsely settled, it being

estimated that there are approximately 1000 residents in that area.

In the general area there are several institutional uses. They include the following: The Sherwood School, approximately a mile to the east of the subject property, a large public school, which is a combined elementary and junior senior high school complex having approximately 1880 pupils on 30.2 acres of land. In the general neighborhood, St. John's Episcopal Church operates a school which includes a kindergarten and an elementary school. St. Peter's Roman Catholic Church has an elementary school. There is also a Quaker day and boarding school for students of secondary years.

Edward L. Silver, who owns the stock in the two appellant corporations, has been a teacher and director of educational facilities for over 12 years. He owns and operates three nursery schools in the State of New York which are accredited under the laws of that State. He has obtained a master's degree from New York University in early childhood education and is completing work at that University for his doctorate in the same field. He testified at the hearing before the Board that the plan was to build a building for approximately 100 students in the winter time with a possible (and hoped for) ultimate enrollment in the nursery school of 350 children, ranging in age from 3 to 5, split into two sessions, one session in the morning and one session in the afternoon, and 950 children, ranging in age from 3 to 12 in the summer recreational program for the entire day. The summer students will be housed in tents (10 to a tent) in an open field during the summer program. A swimming pool will be constructed and during the summer the program will consist of activities such as swimming, baseball, arts and crafts, nature study and similar activities. The first building to be constructed will consist of 6 classrooms designed for 15 children per room with possibly a multipurpose room. There will be a riding stable for 4 horses. If the school enrollment reaches its ultimate goal, the children will be brought to the subject property during the winter in 35 station wagons. During the summer, 14 or 15 buses will be used to transport the increased number of children. The plan at the beginning is to use 10 station wagons during the winter with an additional 4 buses during the summer.

Mr. Hayden testified that in his opinion the proposed use would not be detrimental to the use or development of the adjacent properties or of those in the general neighborhood. He was also of the opinion that the addition of 35 station wagons and 15 buses going in and out of the subject property twice a day would not impose a hazardous condition on Route 108, although he admitted that he had not personally made any traffic counts. He had obtained two traffic counts from the State Roads Commission of Maryland on Route 108 for the average 24 hour count for 1962 which showed that just east of Olney there were 3625 vehicles a day, while just west of Ashton there were 3650 vehicles a day. There are no immediate plans to widen or otherwise substantially improve Route 108 near the subject property. Mr. Hayden was also of the opinion that the noise generated by the proposed operation would not create a nuisance.

John Zimmerman, an architect from New York City, testified for the applicants in regard to the proposed structures, screening and planting on the subject property and proposed parking facilities for the motor vehicles to be used in connection with the contemplated operation.

The Site Plan, as revised, prepared by Mr. Zimmerman (Exhibit 48-B), graphically portrays the proposed use at its ultimate capacity. The entrance road from Route 108 is laid out in approximately a north-south direction through the center of the panhandle. On the east side of the entrance road, approximately 150 feet from Route 108 is an area for bus parking and farther to the north and on the east side of the entrance road is an area for the parking of 100 automobiles. Directly across the entrance road, from the 100 car parking area, is another parking area for 100 automobiles. The entrance road then proceeds in an approximately easterly direction about 50 feet from the southerly boundary of the Daymude parcel and to the north of the entrance road at this point are the principal buildings to be constructed. They consist of a large multipurpose room with a capacity of 300, on the south of which is a kitchen and lobby. To the north of this building is an amphitheater. To the east of the multipurpose room (and connected to it by a closed corridor are four buildings containing 6 classrooms each, a total of

24 classrooms. To the east of the multipurpose building is the tent camp and to the northeast of that area is the lake. The stable, bridle path and corral are located at the northerly end of the subject property, the northerly end of the stable being 105 feet from the northerly property line. There are two swimming pools to the west of the stable which are 90 feet from the northerly property line. There is a combined tennis, basketball and handball court to the east of the swimming pools. To the northeast and east of the principal buildings is a shelter area for 10 shelters. There is also an arts and crafts building in this area. There are also softball, badminton and volleyball fields, a pitch and putt golf area as well as an archery area. The tabulation on the Revised Site Plan shows the following:

| | |
|---|---|
| Nursery School-24 classrooms at | |
| 15 children each | 360 |
| Tent Camp Capacity | 290 |
| Shelters: 10 centers at | |
| 15 children each | 300 |
| Total Children | 950 |

Mr. Zimmerman was of the opinion that the proposed construction and operation would not create any nuisance by reason of dust, gas, smoke or odor or by reason of noise.

Henry J. Connor, who had been in the building and real estate business for over 30 years and who was generally familiar with the area in which the subject property is located, and who owned a property which partially abuts the subject property, testified for the applicants that in his opinion the proposed use would not adversely affect the general development of the community.

In opposition to the granting of the application, the protestants offered the testimony of Clarke W. Slade, who has resided in the neighborhood of the subject property since 1937 or 1938. He was the former head master of the Slade School in Sandy Spring for approximately 20 years and for 5 years prior to his experience as head master, he was in the Baltimore City School System. He was also a consultant to 5 of the private schools in Baltimore City for approximately 5 years. At the

560

present time he is the Chief Psychiatric Social Worker of the Episcopal Home for Children in Washington, D. C., and is a counsellor to the Committee on Education of the American Foreign Service Association. When he first learned of the proposed use he had no strong feeling about it, one way or the other, but after he had made a personal investigation in New York State of the existing operation of schools there by Mr. Silver (or his controlled corporations) he became unalterably opposed to the proposed use. He investigated the Valley Stream School which is operated on approximately three and one-half acres of land. It has approximately 800 students. Mr. Slade described the result of his investigation as follows:

> "Well, I went to Valley Stream. I could only describe what I saw there with the word 'slovenly', I believe. The entrance to the school is through a sort of a court yard, in which there were a bunch of station wagons parked and a pile of discarded tires and a tow truck. Then you get on into the grounds of the school, proper, and they were quite denuded of grass. They had a zoo, so-called, consisting of a few animals and a fruit tree of some sort with cherries or something dropping down. And there was an offensive odor about that. There was in the middle of the grounds a drinking fountain which had a muddy spot around it probably eight or ten feet in diameter. I was there on a Sunday afternoon. I could understand that if a school week ended, the children had gone, there would be some litter around. But it seems to me that it ought to have been cleaned up on a Sunday.
>
> "There were dirty towels. There were articles of apparel. The so-called tent area had tents very close together, some of which were down off their poles. There were Coke bottles. There were just general things that were not neat and tidy.
>
> "There was nothing about it that would be attractive. And it did not seem to me to bear out the printed literature which is used for promotional purposes at Valley Stream School. It was not attractive."

\* \* \*

"Those are the things which I observed by eye. The school also has a loudspeaker which I could observe by ear. I was there also on Monday morning at the time that the children were being brought to the school. I had occasion to hear the loudspeaker blast off, which can be heard for a substantial distance around. Those are my chief impressions of the physical appearance of the Valley Stream School."

Mr. Slade's testimony was confirmed by affidavits, received into evidence by the Board, of Frederick Contanzo, Dr. Burrell Walters and Lyda Walters, William and Margaret Larson and Gina Cohen, residents who had lived for a number of years adjacent or contiguous to the Valley Stream School.[1]

Mr. Slade was of the opinion that the proposed use would adversely affect the enjoyment and value of properties adjacent to or near the subject property as well as those in the general neighborhood. He pointed out that the three non-profit private or parochial schools in the general neighborhood are all "quite compatible with the character of Sandy Spring," but the proposed use—which would have 950 students at its proposed maximum operation as compared with an estimated 1000 per-

---

1. Characteristic of these affidavits is that of Dr. and Mrs. Walters which states, in part, as follows: "* * * Ever since the camp has been in operation, we have been unable to sit in our back yard. We were told that along the fence of our property there would be a nature walk. No such nature walk was ever had, but in its place from the beginning, there are basketball and volleyball courts. We constantly have debris thrown over the fence and into our yard and even had a burning log from a camp fire thrown over the fence. The children of the camp are constantly peeking through the fence with the result that we have no privacy and they have also gotten on the top of the fence and made very insulting remarks. There is constant noise and whistles blowing from the camp. We are certain that we would have a great deal of difficulty in attempting to sell our house if prospective purchasers were to know that a camp was in operation in our back yard. * * *."

On the other hand, the applicants introduced three affidavits from immediate neighbors of the Valley Stream School who indicated that the school was a completely "satisfactory neighbor" and that "the community has benefitted greatly by their operation."

sons living in the general community—would be incompatible with the neighborhood, would result in a hazard to the community, and would create a nuisance from noise and increased traffic. Mrs. Slade, who accompanied her husband on his trip to New York, corroborated his testimony in regard to the conditions at the Valley Stream School.

Francis K. Metzger, a consulting engineer and for 15 years Assistant Supervisor of Assessments for Montgomery County, and also a member of the Board of Education of that county for 10 years with particular responsibility for the selection of land sites for Montgomery County schools, testified for the protestants. He was familiar with the subject property and neighboring properties. Although he is "very sympathetic to any form of education", it was his opinion that the subject property was the wrong site for the proposed use, would create a nuisance, resulting from noise and traffic and the proposed use would have a devaluating effect upon the surrounding properties.

Jesse E. Aiken, a qualified realtor, testified for the protestants that he was familiar with the subject property and surrounding properties. In his opinion the proposed use would decrease property values in the neighborhood. This would be caused by the substantial increase in traffic and in the noise which would likely result from the proposed operation. He estimated that, for example, the value of the Beebe property, which adjoins the subject property on the south, and which had been appraised by Mr. Aiken, would be reduced by 25%, and stated his reasons for his opinion.

In addition to Arthur D. Farquhar, already mentioned, Dr. Stephen O. Beebe, who owns nearby property, and Delmas Wood, Jr., who owns properties adjoining the subject property, also testified in opposition to granting the special exception.

There was no testimony offered in regard to the specific nature of the operation of the schools operated by the Quakers, St. John's Episcopal Church or St. Peter's Roman Catholic Church.

The majority of the Board in a carefully considered opinion, after reviewing the facts, concluded:

"The Board finds that the petitioner has not met the burden of proof to show that the traffic generated by the transportation of 350 to 950 children, the minimum faculty, an undetermined number of assistants and the administrative staff will not be a nuisance in the community. Nor has the petitioner shown in contradiction to the evidence presented by the opposition, that the noise and physical activity of 350 to 950 young children will not constitute a nuisance.

"Accordingly, the Board must rule that the special exception for the private educational institution (Section 104-29(m)1(c)(5)), the child care home (Section 104-29(i)1(e)) and the attendant riding stable (Section 104-29(w)(2)) must be *denied.*"

In the dissenting opinion of the Board, it was indicated that in the opinion of the minority of the Board, insufficient weight had been given by the majority to Mr. Hayden's testimony in regard to the traffic hazard and noise factor and that the operation of the New York schools was not comparable to the proposed operation because the acreage of the subject property was approximately 10 times larger than the largest site of the New York facilities. The minority was of the opinion that the applicants had met the burden of proof placed upon them by the Zoning Ordinance, considering the record as a whole.

Judge Pugh, in affirming the decision of the Board, filed a helpful and carefully considered opinion in which the applicable provisions of the Zoning Ordinance and the testimony were analyzed. He concluded that under the prior decisions of this Court and in view of the decision of the Supreme Court of Errors of Connecticut in *St. John's Roman Catholic Church v. Town of Darien,* 149 Conn. 712, 184 A. 2d 42 (1962)—on which he strongly relied—it could not be said that the provisions of the Zoning Ordinance were clearly arbitrary, unreasonable and capricious, having no substantial relation to the public health, safety or general welfare. He also indicated that the applicants had not met the burden of showing that the proposed use would not be a nuisance that issue being fairly debatable and not clearly erroneous.

We agree with the conclusions of the lower court and will affirm the Order of July 7, 1965, affirming the decision of the Board.

Three questions are presented by this appeal for our decision:

I. Is the Zoning Ordinance, as construed and applied by the Board, unconstitutional as containing an allegedly unlawful and unreasonable discrimination between public schools and recreational facilities and private schools and recreational facilities?

II. Is the Zoning Ordinance, as construed and applied by the Board, unconstitutional as containing an allegedly unlawful and unreasonable discrimination between parochial schools and private schools?

III. Was the action of the Board in holding that the applicants did not meet the burden of proof that the proposed use would not create a nuisance because of traffic, noise and physical activity unsupported by sufficient evidence so that its action is arbitrary, unreasonable and capricious and, therefore, illegal and void?

As we have indicated these questions, in our opinion, must all be answered in the negative.

## I.

The Montgomery County Zoning Ordinance in Section 104-5-(a) setting forth the uses permitted in an R-A Zone provides for certain permitted uses including:

> "Publicly owned or government operated buildings and uses, including community buildings and public parks, playgrounds and other recreational areas."

This same subsection also permits:

> "Churches, convents, monasteries and other places of worship"

and

> "accessory buildings and uses."

Section 104-5-(b) is entitled "Special Exceptions" and lists, among other uses which may be permitted by the granting by the Board of a special exception:

> "Child care homes
> Educational institutions, private
> Riding stables."

Section 104-29(m) sets up the standards which guide the Board in granting a special exception for private educational institutions.

By Section 104-29(m)1(c)(5) the Board is authorized to grant as a special exception, among other uses, the following:

"m. Educational institutions, private.

1. In any Residential Zone, a lot, tract or parcel of land to be used for a private educational institution upon a finding by the Board that said use will not constitute a nuisance because of traffic, number of students, noise or type of physical activity and if the lot, lots or tract of land on which the building or buildings to be used by said institution are located conform to the following minimum area, frontage and setback requirements.

(c) Private Educational institutions, other than those covered by (a) and (b) above.

(5) All institutions where the maximum attendance at any one time exceeds forty students.
Total Area—30,000 square feet
Frontage—200 feet
Setback—25 feet from all property lines."

Section 104-29(m)(2) provides:

"2. The requirements of this subsection (m) shall not apply to the use of any lot, lots, or tract of land for any private educational institution which is a parochial school or which is located in a building or on premises owned or leased by any church or religious organization, the Government of the United States, the State of Maryland or any agency thereof, Montgomery County, or any incorporated village or town within Montgomery County."

Section 104-29(w)(2) provides:

"w. Riding stable.

(2) If three or more horses are kept, the stable shall be located on a tract of not less than five acres."

In regard to Child care homes, Section 104-29(i)1(e) provides:

"i. Child Care Homes.

(1) In any residential zone, a child care home upon a finding by the Board that said use will not constitute a nuisance because of traffic, number of children being cared for, noise or type of physical activity and if the lot, lots or tract of land and building or buildings to be used, by said child care home conform to the following minimum area, frontage and setback requirements:

(e) Child care homes providing child care to more than forty children at any one time.
Total area—30,000 square feet
Frontage—200 feet
Setback—25 feet from all property lines."

The appellant corporations earnestly contend that the zoning restriction upon the location of a private school and the use of land for that purpose has no substantial relation to the public health, safety, morals or general welfare and is consequently arbitrary, unreasonable and capricious resulting in a denial of due process of law to them contrary to the provisions of Article 23 of the Declaration of Rights of the Maryland Constitution and the Fourteenth Amendment to the Constitution of the United States and also denies them the equal protection of the laws as prohibited to the States by the Fourteenth Amendment.

We agree, of course, with the appellants that a zoning restriction upon the use of land would be unconstitutional as a denial of due process of law unless it had some substantial relation to the police power. As our predecessors stated in *City of Baltimore v. Cohn,* 204 Md. 523, 530, 105 A. 2d 482, 486 (1954) citing with approval and following the decision of the Supreme Court of the United States in *Nectow v. Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842 (1928):

"However, the governmental power to interfere by zoning regulations with the general rights of the landowner by restricting the character of the use of his

land is not unlimited, and such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare. Legislative bodies have no authority, under the guise of the police power, to impose unreasonable and unnecessary restrictions on the use of private property in pursuit of useful activities."

The appellants, however, rely on the well recognized line of cases representing the weight of authority in the United States, that it is unconstitutional to prohibit private schools in zoning districts where public schools are permitted.[2] Many of these cases are reviewed and analyzed in Curry, *Public Regulation of the Religious Use of Land* (1964). See also Rathkopf, *The Law of Zoning and Planning* (3rd Ed.) Vol. 1, pp. 18-21 to 18-27; Yokley, *Zoning Law and Practice* (2d Ed.) Vol. 1, p. 89.

In our opinion, reliance upon these cases is misplaced. There is no attempt in the Montgomery County Zoning Ordinance *to prohibit* the establishment of private schools in a zoning district where public schools are permitted. On the contrary, private schools *are permitted* in the same zoning district as the public school by way of special exception to be granted by the Board if the applicant for the permit to establish the private school establishes that the proposed private school use will not constitute a nuisance because of traffic, number of students, noise or type of physical activity and the other standards set forth in the Zoning Ordinance for the guidance of the Board.

In addition to this distinction based on the different nature

---

2. Alabama-Phillips v. City of Homewood, 255 Ala. 180, 50 So. 2d 267 (1951); California-Roman Catholic Welfare Corp. v. City of Piedmont, 45 Cal. 2d 325, 289 P. 2d 438 (1955); Florida-City of Miami Beach v. State ex rel. Lear, 128 Fla. 750, 175 So. 537 (1937); Illinois-Catholic Bishop of Chicago v. Kingery, 371 Ill. 257, 20 N. E. 2d 583 (1939); City of Chicago v. Sachs, 1 Ill. 2d 342, 115 N. E. 2d 762 (1953); Minnesota-State v. Northwestern Preparatory School, 228 Minn. 363, 37 N. W. 2d 370 (1949); New York-Diocese of Rochester v. Planning Board, 1 N. Y. 2d 508, 136 N. E. 2d 827 (1956). See also Urnstein v. Village of Town and Country, 368 S. W. 2d 390 (Mo. Sup. Ct. 1963).

of the zoning ordinances involved, in the case at bar the applicants not only seek a permit to establish a private school but also permits for a riding stable and a child care home which additional uses were not involved in the cases on which the applicants rely.

The appellants in their brief and in argument before us stated that "* * * the Appellants * * * have never and do not now contend that they are excused from applying for a special exception," and, indeed, they applied for the granting of a special exception under the Zoning Ordinance in this case.

Under these circumstances it is most doubtful that the appellants may challenge the *constitutionality* of the Zoning Ordinance under which they have sought relief. See *Fahey v. Mallonee,* 332 U. S. 245, 67 S. Ct. 1552, 91 L. Ed. 2030 (1947). See also *Diocese of Rochester v. Planning Board,* 1 N. Y. 2d 508, 519-520, 136 N. E. 2d 827, 832 (1956), and cases cited.

Assuming, without deciding, that the constitutional issues are before us, we have concluded that the requirements and the guides and standards to be considered by the Board, for granting a special exception for a private educational institution are reasonable and do have a substantial relation to the public health, safety and general welfare, and further that there is a reasonable basis to classify differently public schools, on the one hand, and private schools, on the other, so far as requiring a special exception for the private school with no such requirement for a public school. The appellants are not, therefore, denied due process of law or the equal protection of the laws.

It is clear that buildings in which a large number of people gather, with the attendant dangers from fire, disease, traffic, and noise present a classic example of a situation in which the police power of the State may properly be used for the public protection. The location and construction or authorization of the erection of public buildings in Montgomery County may not occur until submitted to and approved by the Maryland-National Capital Park and Planning Commission. Montgomery County Code, Article 72, Section 73. Under Article 2, Sections 131 to 133 of that Code, procedures are established requiring public hearings and notice before any land may be acquired for any public purpose by Montgomery County, by the Montgomery

County Board of Education or even by chartered fire departments. It is thus seen that the public generally, including the neighboring property owners, may appeal and be heard in regard to the various possible hazards involved in connection with the location and erection of any public school. It cannot be supposed that the duly constituted public authorities will fail to give consideration to the facts submitted by those affected, will be indifferent to the hazards involved or will fail to give careful consideration to those hazards, affecting as they well may do, the taxable basis of the surrounding real estate, the road construction and improvement program and other factors of public importance. The private school is not so restricted and it is reasonable to require, in the public interest, that the same factors and hazards which the public authorities must consider in regard to the establishment of public schools be submitted to a public body in regard to private schools. This is what the Montgomery County Zoning Ordinance requires. This requirement is a reasonable exercise of the police power. It does not deny equal protection of the laws.

We find the case of *St. John's Roman Catholic Church v. Town of Darien,* 149 Conn. 712, 184 A. 2d 42 (1962) *supra,* persuasive on this point. In *Town of Darien,* the zoning ordinance permitted the establishment of a public school, without applying for a special exception, in a residential district in which private and parochial schools were required to apply for a special exception. In sustaining the validity of the Town of Darien zoning ordinance, Mr. Justice Alcorn of the Supreme Court of Errors of Connecticut stated:

> "Neither article first, §1, of the Connecticut constitution nor the fourteenth amendment to the federal constitution has ever been held to prevent legislative bodies from dealing differently with different classes of persons, provided there is some natural and substantial difference germane to the subject and purposes of the legislation between those within the class included and those whom it leaves untouched. *Lyman v. Adorno,* 133 Conn. 511, 520, 52 A. 2d 702. If the distinction made by these regulations between public and private schools meets this test, the regulations are valid.

"If we keep in mind the generally recognized purposes of zoning regulations, from which those now involved do not differ, a clear basis appears for the additional requirements demanded of parochial and private schools. The regulations, in substance, require only that, in addition to the uniform standards set for the R-2 zone, such schools must submit to the planning and zoning commission a plan showing pertinent details of the proposed use, such as the location of buildings, parking areas, traffic access and drives, open spaces and landscaping. Thereupon, the commission is required to consider the physical aspects of the project at a public hearing from the standpoint of its harmony with the appropriate and orderly development of the district and its effect on the appropriate development, use, and value of adjacent land and buildings. The public school on the other hand is entirely a creature of statute. A public school building project must have the approval of the planning commission or of the legislative body of the municipality in the event the planning commission disapproves. General Statutes §8-24. It must also have the approval of the town board of education and the town building committee, and the plans must be filed with the state board of education before construction is begun. General Statutes §10-291. All of these requirements tend to assure that those objectives which are the fundamental purpose of a zoning ordinance will be safeguarded." (page 48 of 184 A. 2d)

## II.

Section 104-29(m) of the Montgomery County Zoning Ordinance already set forth in full above, is ambiguous and requires judicial construction. Taking the Zoning Ordinance as a whole [3] and considering the provision in Section 104-5, already quoted,

---

3. We must consider the Ordinance as a whole in seeking to ascertain the legislative intent when the language of the statute is ambiguous. State Department of Assessments & Taxation v. Ellicott-Brandt, Inc., 237 Md. 328, 335, 206 A. 2d 131, 133 (1965).

in regard to permitting churches and accessory buildings and uses in residential use districts, we are of the opinion that the word "parochial" should receive its ordinary and usually accepted meaning as "of or pertaining to a parish" so that the "parochial school" mentioned in Section 104-29(m) is a school used in connection with a parish as an accessory use to the church, convent, monastery or other place of worship operating the school. The words "or which is located in a building or on premises owned or leased by any church or religious organization" refers back to—the words "parochial school" and the remaining language "or owned or leased by * * * the Government of the United States, the State of Maryland or any agency thereof, Montgomery County or any incorporated village or town within Montgomery County," applies to *public schools* operated by those governments or governmental agencies so that the words "any private institution" only apply to parochial schools and not to the governments or governmental agencies mentioned who do not, and cannot, operate *private* educational institutions. The Montgomery County Council intended in our opinion, to make it clear that the absolute permission previously given to churches and other places of worship *and "accessory buildings and uses"* was to include parochial schools which from early times until now have always been considered as properly operated by religious institutions as incidental to religious institutions. See *Yanow v. Seven Oaks Park, Inc.,* 11 N. J. 341, 94 A. 2d 482, 36 A.L.R.2d 639 (1953).

As interpreted by us, it is clear that parochial schools need no special exception in a residential use district whereas such private schools which are not parochial schools are required to apply for a special exception to obtain a permit to establish such a private school.

In addition to the difficulty which the appellants have in raising the constitutional issues in regard to the parochial school exemption from obtaining a special exception for the reasons already considered, they are faced with the additional difficulty in this situation, of there being no evidence in the record that any of the parochial schools in Montgomery County operate a school comparable in scope, policy, physical facilities and nature of use to those involved in the case at bar. It seems clear that

if a person seeks to rely upon the denial of the equal protection of the laws, that person has the burden of showing that his situation is the same as the situation complained of, and that the State, or its instrumentalities has treated the two situations differently in an unreasonable or arbitrary manner. See *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 78-79, 31 S. Ct. 337, 55 L. Ed. 369 (1911), cited with approval and followed on this point in *Madden v. Kentucky*, 309 U. S. 83, 88, 60 S. Ct. 406, 84 L. Ed. 590, 125 A.L.R. 1383 (1940). See also *Morey v. Doud*, 354 U. S. 457, 464, 77 S. Ct. 1344, 1 L. Ed. 2d 1485 (1957). Moreover, if any state of facts reasonably can be conceived that would sustain the classification, the existence of that state of facts at the time of the enactment of the statute must be assumed. *Lindsley v. Natural Carbonic Gas Co., supra.*

Again assuming, without deciding, that the appellants may raise this constitutional issue, we are of the opinion that the requirement that the private school, not parochial, obtain a special exception but that the parochial school within the meaning of the ordinance, need not obtain one, is not unreasonable, arbitrary and capricious and does not deny the appellants the equal protection of the laws.

A church or religious organization operating a parochial school in the community which it serves, is by its nature sensitive and responsive to the needs of the community and any hazards which the operation of the parochial school will have generally and also specially on the neighboring property owners. The attending children are generally residents in the neighborhood. It is usually financially dependent upon the good will of its adherents in the community. These considerations and the spiritual values it promotes, could lead a legislative body to conclude that the hazards involved in the operation of a school would be less likely to arise in the establishment of an accessory parochial school, than would be the case in the establishment of private schools other than parochial schools. *Cf. Yanow v. Seven Oaks Park, Inc., supra,* which involved a case in which public and parochial schools were classified together and permitted in the Residence "A" District created by the zoning ordinance of the City of Orange, but private schools,

clubs, lodges, social community centers and recreation buildings were prohibited unless the application for the erection of those buildings had the written consents of 80% of the lot owners within 200 feet of the property in question. Although the Supreme Court of New Jersey did not pass upon the issue before us in the case at bar, the opinion has the following relevant observations:

"Parochial schools, as the term is used in this ordinance, connote private schools, at which schools (in addition to religious instruction) students are given courses of study sufficient to qualify attendance thereat as compliance with compulsory education requirements. See R.S. 18:19-7, N.J.S.A. Thus they are in the juridical concept schools conducted by a religious order, but which provide grammar and high school training in accord with statutory requirements. They are therefore in the same general category as public schools for zoning purposes and are so grouped in the ordinance."

"* * * In its generic legal sense, 'parish' did not denote any specific religious faith or denomination at the common law, and the State Legislature clearly has not confined its meaning in the provisions of the school laws hereinbefore adverted to. Nor did the municipal governing body in the ordinance in question. 'Parochial' means 'of or pertaining to a parish,' or confined or restricted to a parish. See 31 Words & Phrases, p. 100; 67 C.J.S., p. 876. Further, the word 'parish' is used in clause 2(a) (5) of the ordinance, *supra,* as applicable to all churches (viz., 'churches and other places of worship, parish houses, Sunday school buildings'), and not merely to one particular religious order or denomination.

"Therefore we have concluded that the sense in which the phrase 'Public and Parochial Schools' was used in this ordinance includes elementary (grammar) and intermediate (high) schools, whether operated by the State or a religious organization, for the *principal* purpose of education of children of the

community in those subjects or courses required under the statutes relating to compulsory education and religious instruction also in the case of parochial schools." (Pages 350-351 of 11 N. J., pages 486-487 of 94 A. 2d).

It is interesting to note that the General Assembly of Maryland in the Acts of 1947, Chapter 489, Code (1957), Article 77, Section 25, required all private schools or educational institutions, *"except those operated by bona fide church organizations"* to obtain a certificate of approval from the State Superintendent of Schools of Maryland before they could begin or continue to operate in Maryland, thus making a similar (but perhaps broader) type of classification as is involved in the case at bar. Our predecessors in *Schneider v. Pullen*, 198 Md. 64, 81 A. 2d 226 (1951) sustained the constitutionality of the guides and standards set forth in the act for the guidance of the State Superintendent in issuing the certificates of approval, but did not specifically consider the portion of the statute above quoted.

We agree with the appellants that the mere fact that a private school may operate for profit while a parochial school generally does not, would not be, in itself, a sufficient distinction to justify a different treatment by the legislative body. There may well be private schools which are not parochial within the meaning of the ordinance, and which operate on a non-profit basis, but which may also be required to obtain a special exception under the Montgomery County Zoning Ordinance.

### III.

We are of the opinion that there was substantial evidence before the Board which would justify it in concluding that the appellants did not meet the burden upon them of establishing that the "proposed use would not constitute a nuisance because of traffic, number of students, noise or type of physical activity." We have already set out the testimony before the Board somewhat fully and it need not be again repeated. The testimony in regard to the scope and nature of the proposed use, together with the testimony of Mr. Slade, and supporting data, Mrs. Slade, Mr. Metzger, Mr. Aiken, Mr. Farquhar and of Mr. Wood are sufficient, in our opinion, to make this issue "fairly

debatable" and we may not substitute our judgment for that of the Board. *City of Baltimore v. Borinsky,* 239 Md. 611, 625, 212 A. 2d 508, 516 (1965) and prior cases therein cited.

*Order affirmed; the appellants to pay the costs.*