Vincent RENZI, et al.

v.

CONNELLY SCHOOL OF THE HOLY CHILD, et al.

No. JFM–99–1512.

United States District Court, D. Maryland.

Aug. 31, 1999.

Vincent Renzi, Washington, D.C., for plaintiff.

William K. Wilburn, Seyfarth, Shaw, Fairwather & Geraldson, Washington, D.C., for defendant.

## OPINION

MOTZ, Chief Judge.

Defendant, Connelly School of the Holy Child, Inc. ("Connelly School" or "the School"), operates a private religious school on a property located in Potomac, Maryland. The property is owned by a religious organization. Plaintiffs live directly across the street from the School. The School has planned and begun the implementation of a construction project that includes a new building and two new parking lots. The School has not obtained a special exception under section 59–G–2.19 of the Montgomery County Zoning Ordinance, subsection (c) of which exempts, *inter alia,* from the special exception requirement "any private educational institution, or parochial school, which is located in a building or on premises owned or leased by any church or religious organization."

■ Plaintiffs seek a declaratory judgment that this exemption violates the Establishment Clause of the First Amendment. They also seek an injunction prohibiting the School from proceeding with its construction project. Montgomery County has, without objection, intervened as a defendant. There are no material facts in genuine dispute, and cross-motions for summary judgment have been filed. I find that section 59–G–2.19(c) is unconstitutional and there-

fore will enter summary judgment on behalf of plaintiffs.[1]

## I.

The Montgomery County Code generally requires that a special exception be obtained before commencing construction of nonconforming buildings and other structures on residentially zoned land. Section 59–G–2.19(c) of the Montgomery County Zoning Ordinance provides an exemption from this requirement. It reads as follows:

(c) Exemptions. The requirements of this section shall not apply to the use of any lot, lots or tract of land for any private educational institution, or parochial school, which is located in a building or on premises owned or leased by any church or religious organization, the government of the United States, the State of Maryland or any agency thereof, Montgomery County or any incorporated village or town within Montgomery County.

Section 59–G–2.19(c), in slightly different form, was first adopted almost fifty years ago. It appeared in the 1950 Montgomery County Code and read as follows:

The requirements [of a special exception] ... shall not apply to the use of any lot, lots, or tract of land for any private educational institution which is a parochial school or which is located in a building or on premises owned or leased by any church or religious organization, the Government of the United States, the State of Maryland or any agency thereof, Montgomery County, or any incorporated village or town within Montgomery County.

In 1966 the Maryland Court of Appeals construed the language of the 1950 ordinance in a case brought by a nonreligious private school that had been denied a special exception. *See Creative Country Day Sch. of Sandy Spring, Inc. v. Montgomery County Bd. of Appeals*, 242 Md. 552, 219 A.2d 789 (1966). The court reached the somewhat strained conclusion that all "private schools which are not parochial schools are required to apply for a special exception" even if located on governmental property.[2] *Id.* at 799. The court also

---

**1.** In passing, the County questions plaintiffs' standing. While admitting that "plaintiffs have pled allegations that, if true, might confer standing upon them ...[,] the allegations, as pled with no evidentiary support, do not suffice." Mem. of Montgomery County in Supp. of Mot. for Summ. J., at 3. There is an absence of any evidentiary record concerning the effects of the School's proposed development of its property upon the surrounding neighborhood precisely because of the School's exempt status under section 59–G–2.19(c). Whether or not the value of plaintiffs' property will diminish if the School commences its construction plans, as plaintiffs allege, the injury they have suffered, although intangible, is very real. They have been deprived of the opportunity to participate in the public zoning hearing which would be part of the special exception process they contend the School is required to pursue. That injury clearly is more than "a mere abstract objection to unconstitutional conduct." *Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir.1997).

**2.** Although it does not clarify the court's reasoning in other respects, it is interesting to note that the Court of Appeals drew a distinc-

tion between parochial schools, that is schools attached to a particular parish, and all other private schools, presumably including religious schools, that draw their student bodies from a wider community. In making this distinction, the court stated as follows:

A church or religious organization operating a parochial school in the community which it serves, is by its nature sensitive and responsive to the needs of the community and any hazards which the operation of the parochial school will have generally and also specially on the neighboring property owners. The attending children are generally residents in the neighborhood. It is usually financially dependent upon the good will of its adherents·in the community. These considerations and the spiritual values it promotes, could lead a legislative body to conclude that the hazards involved in the operation of a school would be less likely to arise in the establishment of an accessory parochial school, than would be the case in the establishment of private schools other than parochial schools.

219 A.2d at 800. Ironically, under this distinction, the Connelly School, which is not

seemed to interpret the clause "or owned or leased by ... the Government of the United States, the State of Maryland or any agency thereof, Montgomery County or any incorporated village or town with Montgomery County" as providing an exemption to public schools. This interpretation likewise seems somewhat odd since the clause was by grammatical necessity tied (through the pronoun "which") to the phrase "private educational institution."

Ten years later the Montgomery County Council effectively overruled *Creative Country Day* by adopting the language that presently appears in section 59–G–2.19(c). In the preamble to the amendment, the Council provided the only express legislative history that is known to exist about any portion of the section. The pertinent portion of the preamble reads as follows:

> The Council agrees that Section 59–142(c) of the Zoning Ordinance is subject to several interpretations and that it requires clarification. In *Creative County [sic] Day School vs. County Board of Appeals,* 242 Md. 552, 570[, 219 A.2d 789(1966)], the Court held that while parochial schools, as accessory uses to the church, were exempt from the special exception requirements, private schools which are not parochial schools do not share the same exemption and must apply for a special exception to obtain a permit to establish such a private school. The Council is of the opinion that it would be in the public interest to modify the exemption clause of Section 59–142(c) ... to clarify that, in addition to the Court held interpretation, .... The Council feels that this modification will aid in a program for the

orderly and efficient reuse of underutilized public schools.

Under the present language of the ordinance only private educational institutions, whether sectarian or nonsectarian, located on property owned or leased by a church or religious organization or on governmental property are entitled to an exemption from the special exception requirement.[3]

## II.

### A.

■ The parties agree that the test of *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), governs the validity of section 59–G–2.19(c) under the Establishment Clause. That test has three prongs: "[f]irst, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally the statute must not foster 'an excessive government entanglement with religion.'" Plaintiffs concede that section 59–G–2.19(c) meets the third of these prongs. They allege, however, that it fails under the first two.

■ Before focusing on the questions of whether section 59–G–2.19(c) has a secular purpose or advances religion, I will make two broad observations. The first is a truism. The constitutional policies underlying the Establishment Clause and the Free Exercise Clause are in fundamental conflict with one another. Maintenance of a creative tension between them requires both appreciation of principle and tolerance of the indefinite. It likewise requires that absolutist logic yield to reasoned judgment. Second, the principle of neutrality, although not a talisman, expresses a con-

attached to a particular parish, would not have been entitled to the special exception exemption.

**3.** The School contends that public schools remain covered by section 59–G–2.19(c) despite the fact that the 1976 amendment clearly was intended to make the governmental property language in the last clause applica-

ble to all *private educational institutions.* Moreover, an exemption for public schools would seem to be unnecessary since they are not subject to zoning requirements in the first instance. *See, e.g., Glascock v. Baltimore County,* 321 Md. 118, 581 A.2d 822, 824 (1990); *Board of Child Care v. Harker,* 316 Md. 683, 561 A.2d 219, 223 (1989).

stitutional value underlying both the Establishment Clause and the Free Exercise Clause. In the final analysis, it is on this principle that section 59–G–2.19(c) founders because it fails to be neutral in a context where neutrality is possible.[4] By favoring sectarian schools over most other non-profit private educational institutions, it belies any secular purpose and has a principal effect of advancing religion. Its flaw is reflected in the ease of its remedy. If the Montgomery County Council wants to save section 59–G–2.19(c), all it needs to do is extend the exemption the ordinance affords to all private non-profit schools regardless of who owns the land on which they are located.

### B.

Defendants have articulated three secular purposes of section 59–G–2.19(c): (1) encouraging use of underutilized public school facilities; (2) promotion of education; and (3) alleviation of governmental interference with religion. None of these asserted purposes is sufficient to meet the first prong of the *Lemon* test. Moreover, an examination of the second and third reveal that section 59–G–2.19(c) runs afoul of the second prong of the *Lemon* test as well. I will briefly address each of the purposes suggested by defendants.

### 1. *Encouraging use of underutilized public school facilities*

Pointing to the legislative history of the 1976 amendment to section 59–G–2.19(c), defendants assert that a legislative purpose of the section is to encourage the use of underutilized public school facilities in Montgomery County. That is certainly

true as to the 1976 amendment itself which legislatively overruled the holding of the Maryland Court of Appeals in *Creative Country Day* by extending the special exception exemption to private educational institutions located on governmental property. However, it is equally certain that this is not the purpose of the clause of section 59–G–2.19(c) challenged in this case. By its terms, that clause applies to schools located not on governmental property but on premises owned or leased by a church or other religious organization. Indeed, if the governing purpose of section 59–G–2.19(c) were to encourage the use of underutilized school facilities in Montgomery County, Connelly School—which is located on property owned by a religious organization, not on governmental property—would not be entitled to an exemption and this litigation would never have had to be instituted.

### 2. *Promotion of education*

Defendants next contend that section 59–G–2.19(c) has a purpose of promoting education generally. In support of that contention defendants rely heavily upon *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). In *Mueller* the Supreme Court upheld the constitutionality of a Minnesota statute providing an income tax deduction for tuition, textbooks, and transportation expenses of taxpayers' dependents who attended elementary or secondary school. However, the Minnesota statute provided the tax deduction regardless of whether the dependent attended a public, sectarian, or nonsectarian school. This fact was crit-

---

4. The centricity of the neutrality principle is well illustrated by such cases as *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) (upholding provision of New York Constitution prohibiting legislative repeal of property tax exemption for property used for religious, educational, or charitable purposes), *Texas Monthly, Inc. v. Bullock,* 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (finding unconstitutional a Texas exemption from state sales and use taxes for religious

publications only), and *Finlator v. Powers,* 902 F.2d 1158 (4th Cir.1990) (striking down a North Carolina statute exempting only "Holy Bibles" from state sales tax). *See also Board of Educ. v. Grumet,* 512 U.S. 687, 704, 114 S.Ct. 2481, 129 L.Ed.2d 546 (1994) ("civil power must be exercised in a manner neutral to religion"); *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) (discussed in text, *infra* ).

ical to the Court's finding that the statute had a secular purpose:

> A State's decision to defray the cost of educational expenses incurred by parents-regardless of the type of schools their children attend-evidences a purpose that is both secular and understandable. An educated populace is essential to the political and economic health of any community, and a State's efforts to assist parents in meeting the rising cost of educational expenses plainly serves this secular purpose of ensuring that the State's citizenry is well educated. Similarly, Minnesota, like other States, could conclude that there is a strong public interest in assuring the continued financial health of private schools, *both sectarian and nonsectarian.*

463 U.S. at 395, 103 S.Ct. 3062 (emphasis added).

In contrast, in the present case section 59–G–2.19(c) exempts from the special exception requirement all private schools located on premises owned or leased by religious organizations (most of which will be religious schools) while affording the same exception to only a handful of nonsectarian private educational institutions—those located on governmental property or those located on religiously owned or leased properties. Pressed on the point during oral argument, counsel for the School stated that this discrimination is inconsequential. According to the School's argument, since religious education provides societal benefit, section 59–G–2.19(c) has a secular purpose. This statement reveals a fundamental conceptual flaw in defendants' position. The public welfare may well be benefitted by the education provided, and values instilled, by sectarian schools. However, within the parlance of Establishment Clause jurisprudence, the proposition that a legitimate secular legislative purpose can be the promotion of religious education is an oxymoron. Likewise, by definition, to promote private reli-

gious education alone has a primary effect of advancing religion.

3. *Alleviation of governmental interference with religion*

(a)

█ Unquestionably, as defendants assert, avoidance of governmental interference with religion is a legitimate secular legislative purpose. *See Corporation of Presiding Bishop of Latter–day Saints v. Amos,* 483 U.S. 327, 339, 107 S.Ct. 2862, 97 L.Ed.2d 273 (1987); *Forest Hills Early Learning Ctr., Inc. v. Grace Baptist Church,* 846 F.2d 260, 263 (4th Cir.1988). In the present case, however, it is impossible to glean from the language of section 59–G–2.19(c) that this is a purpose of the ordinance. Section 59–G–2.19(c) does not exempt only sectarian private educational institutions from the requirement of obtaining a special exception. Rather, it affords the exemption to *any* private educational institution—whether sectarian or nonsectarian—"located in a building or on premises owned or leased by any church or religious organization." Under the definition contained in Article 59–G–2.19(c)–A of the Montgomery County Zoning Ordinance, "private educational institutions" include technical and trade schools.

Of course, in the vast majority of cases it is a sectarian school providing traditional elementary and secondary school education that would be located on property owned or leased by a religious organization. However, under the terms of the ordinance, a religious organization could, for the purpose of obtaining income to support its religious purposes, lease property to a nonsectarian private educational institution, even one operated for profit, which could construct facilities on the property without obtaining a special exception. Zoning regulation of such a school would provide no risk whatsoever of governmental interference with religious affairs, particularly if the school provided solely skills training, e.g., a school for beauticians or automobile mechanics.

Thus, a legislative intent to alleviate such interference cannot be attributed to the Montgomery County Council from the language of the ordinance itself.[5]

Moreover, even if the alleviation of governmental interference with religion were deemed to be the secular purpose of section 59–G–2.19(c), that purpose would be constitutionally insufficient. Under *Amos* it must be *significant* governmental interference that the statute is intended to alleviate. 483 U.S. at 339, 107 S.Ct. 2862. Cases such as *Forest Hills Learning Center, Inc. v. Grace Baptist Church*, 846 F.2d 260 (4th Cir.1988), and *Cohen v. City of Des Plaines*, 8 F.3d 484 (7th Cir.1993), upon which defendants rely, are quite different from the present case. They involved exempting church-related nursery schools and child care centers from, respectively, a city zoning ordinance and state licensing laws. The court in each case found that regulating the activity of child care posed a significant risk of entangling the government in religious affairs. Here, defendants do not contend that there is any danger that Montgomery

County will become entangled in regulating the activity of religious education. Requiring the School to obtain a special exception would merely subject its use of the property to such basic zoning considerations as constructing facilities generally harmonious with the neighborhood and preventing excessive traffic congestion.

Defendants argue that these two considerations themselves pose a threat of governmental interference in religious affairs. Montgomery County suggests that architectural review requirements theoretically could be used by a zoning board to block construction of facilities by an unpopular religion. At the same time, however, both the County and the School quickly disavow any history or reasonable foreseeability that zoning boards in the County have abused, or will abuse, their authority in this respect. Therefore, this hypothesized secular legislative purpose is wholly conjectural and does not relate to any identified risk of "significant" governmental interference with religious affairs.[6] If the constitutionality of a statute could be upheld on such a thin reed, legislative bodies

**5.** Nor have the parties, after diligent effort, been able to find any legislative history reflecting such an intent. This is not surprising since the predecessor to section 59–G–2.19(c) was first enacted almost fifty years ago at a time when Establishment Clause jurisprudence had not developed to a stage where a legislative body would have been likely to conceive of founding an ordinance on the constitutional basis that it avoided governmental interference with religion. To the contrary, as a matter of historical fact, it is far more probable that the Montgomery County Council originally exempted parochial schools from the special exception requirement because of the general deference then paid to religious institutions and because of the not unreasonable belief that such schools were subject to non-regulatory social constraints that were likely to make them good neighbors. *See Creative Country Day*, 219 A.2d at 800 (language quoted in footnote 2, *supra*).

I am not suggesting that it is necessary to find that a legislature specifically contemplated a legitimate secular purpose when it enacted a statute challenged under the Establishment Clause. A statute can be held constitutional on the basis of a "contempo-

rary," i.e., present, secular purpose whether or not there is evidence that the legislature conceived that purpose. *See Koenick v. Felton*, 190 F.3d 259 (4th Cir.1999). However, this does not mean that a legislative purpose can be hypothesized which is inconsistent with the statutory language.

**6.** *Boyajian v. Gatzunis*, No. 98–11763–DPW (D.Mass. May 24, 1999) is distinguishable precisely on the ground that the ordinance there in question had originally been enacted to remedy an instance of discrimination against a religious organization. Moreover, the ordinance has been amended over the years to include protection "for a number of nonreligious uses—agriculture, child care facilities, group homes for disabled persons, and solar energy systems—as well." Slip op. at 8.

I also note that to the extent there is a potential risk of discrimination against nontraditional religious groups, e.g., ones perceived as "cults," section 59–G–2.19(c) does not itself necessarily provide an effective remedy. It merely changes the landscape on which potential litigation might proceed, leaving for judicial interpretation what constitutes a "church or religious organization."

dominated by religious groups could run roughshod over the Establishment Clause.[7]

The School, in contrast, has focused not on the alleged danger of interference posed by the power of architectural review but what it perceives as the potentially inhibiting effect of density requirements upon its use of its property. It cites *Keeler v. Mayor of Cumberland*, 940 F.Supp. 879 (D.Md.1996), which factually presents the converse of the situation presented here. In *Keeler*, rather than attempting to build a new facility, a church wanted to tear down what it considered to be a "dilapidated building," but was unsuccessful in its efforts to obtain a permit to do so under a municipal historic preservation ordinance. The court held that the ordinance violated the Free Exercise Clause because it prevented the church from using its assets as it deemed appropriate to further its religious mission. Specifically, the church's position—upheld by the court—was that its razing of the existing building was "the cornerstone of the Parish's plans to improve worship at the Parish, to increase accessibility to worship and other religious services for the handicapped, elderly and other parishioners, and to use its property as an expression of religious belief." *Id.* at 883.

Both the nature of the ordinance in question and the underlying factual context are substantially different in the present case. It is one thing for a legislative body to impose regulatory controls that prevent a religious organization from using its property in reasonable fulfillment of its religious goals. It is quite another to say that because a theoretical danger exists that a zoning board might abuse its power, a legislative body can exempt sectarian organizations, and sectarian organizations alone, from general restraints on property use. If the Montgomery County Zoning

Board were to abuse its power in failing to grant a special exception to a sectarian school, the school could file suit, just as did the church in *Keeler*, to obtain relief under the Free Exercise Clause. But that does not mean that the school, unlike other users of land, may be freed to do whatever it may choose on its property regardless of such basic considerations as traffic congestion and other density concerns.

(b)

The School's contention that only schools located on property owned or leased by religious organizations may be exempted from density requirements also implicates the second prong of the *Lemon* test. By emphasizing the need for it to develop its property without being subject to the constraints of density requirements in order to fulfill its religious mission, the School demonstrates why the exemption afforded by section 59–G–2.19(c) has a principal effect of advancing religion.

It is a stark reality of private elementary and secondary education that tuition rates, which have spiraled upward in recent years, can no longer continue their rate of upward climb. However, the cost of education, including faculty salaries, financial aid (necessary to maintain a diverse student body), construction of facilities, and purchase of equipment continues to soar. For years many private schools have dealt with this problem by increasing the size of their student bodies (essentially surviving on the financial margin each additional tuition brings). They now confront the problem of having reached the physical limitations of their campuses. If sectarian schools, exempted from zoning restrictions, could construct high-rise facilities to accommodate new students but non-profit nonsectarian private schools

---

7. In a similar vein, the County's suggestion during oral argument that if religious property owners abuse their exempt status accorded by section 59–G–2.19(c), County residents can seek relief from the County Council misses the mark. One of the very purposes of the

Establishment Clause is to place constitutional restraints upon legislatures' power to enact in the first instance ordinances and other statutes serving sectarian ends, even if preferred by a majority of citizens (or at least a majority of politically organized citizens).

could not do so, the viability of the latter inevitably would be brought into question.[8]

I do not suggest there is any evidence in the record that Connelly School presently intends to construct a high-rise building or otherwise develop the property on which it is located in a manner that would result in undue traffic congestion or other density problems. However, if the School is taken at its word, it needs the exemption in order to maintain the freedom to enlarge its facilities to whatever extent it concludes its religious mission requires. To confer that freedom upon it, but not upon non-profit nonsectarian private educational institutions as well, would destroy the delicate balance between religious and non-religious institutions required by the Establishment Clause.

Several particular issues concerning certain construction that has proceeded in recent weeks by agreement of the parties remain to be decided. I will therefore defer entering an order implementing this opinion until I have had the opportunity to confer with counsel.

### ORDER

For the reasons stated in the memorandum entered on August 31, 1999, it is, this 2nd day of September, 1999

ORDERED that

1. Defendant Montgomery County's motion for summary judgment is denied;

2. Defendant Connelly School of the Holy Child's motion for summary judgment is denied;

3. Plaintiffs' motion for summary judgment is granted;

8. I recognize that in *Cohen v. City of Des Plaines* the Seventh Circuit (unlike the district court) found unpersuasive similar concerns raised by the owner of a for-profit day care business regarding the anti-competitive effects of exempting nursery schools operated on church property from the requirement of obtaining a special exception. 8 F.3d 484, 492–93 (7th Cir.1993). Assuming the correctness of the Seventh Circuit's view, there is a self-evident distinction between discriminat-

4. Montgomery County Zoning Ordinance § 59–G–2.19(c) is declared to be violative of the Establishment Clause of the First Amendment to the United States Constitution;

5. Defendant Connelly School of the Holy Child is enjoined from engaging in any further construction except completion of paving the parking lot in the rear of the School and completion of the sediment control pond in the rear of the School; and

6. Defendant Connelly School of the Holy Child may maintain the gravel turnaround area in the front of the School until further Order of this Court.

ing in favor of church nursery schools over for-profit businesses and discriminating in favor of sectarian elementary and secondary schools over non-profit nonsectarian elementary and secondary schools. Although the care of children during their preschool years certainly involves some teaching of values, favoring sectarian over nonsectarian institutions that provide education at the elementary and secondary school level obviously would have a greater effect of advancing religion.